SAMUEL W. LYNN, appellant, v. DAVID LYNN et al., appellees.

*Appeal from Henderson.*

On the 18th of April, 1834, M., by a written proposition, offered to sell to S. W. L. a certain tract of land, upon certain specified terms, and allowed three months to decide upon the proposition. On the 26th of June, 1834, S. W. L. wrote to M., stating that his father, D. L., accepted the proposition, and signed the letter "S. W. L., for his father, D. L." On the back of a copy of this letter, on the 19th of July, 1834, M. wrote and executed a covenant to convey the land to S. W. L., "in consideration of the within," and "when he shall have fulfilled on his part the conditions of the said agreement, a copy whereof is hereto annexed." This agreement was delivered to S. W. L., who made payments with money advanced by D. L., and took receipts as for money paid by D. L. S. W. L. took possession of and cultivated the land, D. L. residing with him till his death. D. L. died; S. W. L. paid the balance of the purchase money due upon the land, and the other heirs of D. L. then filed their bill against S. W. L. and M., alleging that the name of S. W. L. had been inserted by mistake in the contract of July 19th, 1834, instead of that of D. L., and praying for a partition of the land among the heirs of D. L., an account of rents and profits against S. W. L., &c. S. W. L., in his answer, under oath, denied the mistake, and averred that the money advanced for the land had been loaned to him by D. L., to secure the payment of which D. L. was to have a lien on the land: *Held,* that the averment, in the answer of S. W. L., as to the loan, was new matter, and being unsupported by proof, was not evidence; that the question for the Court to determine was, whether it was the intention of the parties that the sale and purchase should be for the benefit of D. L. or S. W. L.; that the legal construction of the letter of acceptance of the 26th of June showed a purchase by D. L., and this construction could not be explained by parol, no mistake in that letter being pretended; that the written instruments above named, as well as the parol testimony, show that the name of S. W. L. was inserted, by mistake, in the agreement of the 19th of July, instead of that of D. L., and that there was no error in the decree of the Circuit Court which directed a partition of the land among the heirs of D. L., that S. W. L. should account for the rents and and profits, that he should be paid for the lasting improvements made by him and be refunded the purchase money paid by him since the death of D. L. with interest, and that M. should convey to the heirs according to their respective interests.

BILL IN CHANCERY, filed in the Henderson Circuit Court, by the appellees, as heirs of David Lynn, deceased, against the appellant, Samuel W. Lynn, a co-heir, and Stephen B. Munn, and heard before the Hon. Norman H. Purple.

The bill sets forth in substance: that the appellant and

appellees are heirs at law of David Lynn, deceased; that in 1832 Samuel W. Lynn came to Illinois from Connecticut and settled on a tract of Government land, as a squatter, and returned in 1833; that he persuaded his father David, deceased, to remove to Illinois and purchase and settle on the S. half 1, 10 N. 5 W. of the fourth principal meridian, then owned by Stephen B. Munn; that, influenced by Samuel, the father started, in the spring of 1834, in company with Samuel, and came through New York to ascertain of Munn the terms on which the land could be purchased by David, deceased; that Munn executed a written proposal, and allowed David, deceased, three months in which to accept or reject said proposal, which proposal was in the words and figures following: "Mr. Samuel W. Lynn may also have the S. ½ 1, 10 N. 5 W., in the Military tract aforesaid, for nine hundred and sixty dollars, two hundred dollars cash down, the remainder payable by yearly instalments of one hundred dollars each, interest at the rate of six per cent. per annum on all unpaid at the payment of each instalment; I to give a contract to deliver a warranty deed for same on payment of said seven hundred and sixty dollars, as aforesaid, with interest; money to be paid to Messrs. Tillson, Moore & Co., Quincy, Illinois; Mr. Lynn to let me know if he takes the above sections in three months from this date.

New York, April 18, 1834.          Stephen B. Munn."

That David was old, and left the business principally to Samuel; that the name of Samuel was inserted, instead of the name of David, in said proposition, by mistake, and without David's knowledge, or for convenience, to permit Samuel to act as David's agent; that in this Samuel acted merely as David's agent; that the three months were given to enable David to examine the land and determine whether he would purchase it: that on the 26th of June, 1834, Samuel wrote to Munn, for his father, as follows:

"June the 26th, A. D. 1834.

"Mr. Munn: Sir, my father has concluded to take the S. ½ 1, 10 N. 5 West and pay you as agreed when you send to Quincy a bond for a deed. Then your agent will send

me a line and I will fulfill on my part. You ought not to be so hard with me as to charge me interest this year, for I have to sell the improvement to Jamison the same as I pay you for the lots for to keep peace with the Kentuckians and I shall get nothing from it this year. We all arrived safe; my father enjoys good health, and the rest of us. The wood lot on the bluffs 36, 11 N. 5 W. is a poor lot and I do not want it. I think you could get $150. If you want to take this, please to write. One Elliott wants it for his farm.

Yours, &c.     Samuel W. Lynn,<br>for his father David Lynn."

That on the 19th of July, 1834, Munn wrote a contract on the back of a copy of the above proposition, as follows:

"In consideration of the within, and in fulfillment of the agreement as aforesaid, I do hereby bind myself, my heirs, executors, administrators and assigns, to deliver unto the aforesaid Samuel W. Lynn a full and perfect warranty deed of Lot S. ½ 1, 10 N. 5 W. when he shall have fulfilled, on his part, the conditions of said agreement, a copy whereof is hereunto annexed. In testimony whereof I have hereunto set my hand and seal this nineteenth day of July in the year of our Lord one thousand eight hundred and thirty four.

(signed)     Stephen B. Munn. [SEAL.]

Sealed and delivered in presence of John Tillson, jr."

That the agreement thus made was delivered to Samuel, who paid the first payment out of his father's money, and as his father's agent, and took a receipt from Munn's agents— "Received of David Lynn by Samuel W. Lynn," &c., &c.

That in making out the agreement, Munn, by mistake, referred to the proposition of April 18th, instead of to Samuel's letter of June 26th, and thereby made the contract to run to Samuel instead of David.

That Samuel discovered the mistake, and requested Munn's agents to procure another to be executed to David; that accordingly Munn executed other articles running to David, and sent them to his agents at Quincy to be delivered, (which articles are set out;) that David did not

execute and accept the last mentioned agreement at that time, through the persuasion of Samuel.

That Samuel made further payments on said lands with David's money, and took receipts in David's name up to 20th August, 1840, when David died. That after David's death, Samuel made payment of the balance of the purchase money with moneys belonging to David's estate.

That soon after the purchase, David and Samuel entered into possession of the land; David being a widower, and unable to attend to his own business, lived with Samuel as a member of his family, and permitted Samuel to attend to his (David's) business. That Samuel, up to David's death, always admitted that the land was David's; that he wrote to Munn's agents, November 14, 1834, that the rents of the land were due to his father.

That David Lynn made valuable improvements on the land; that Samuel has had the use of the land since David's death, worth $640 dollars annually; that Samuel sold cattle, &c., belonging to David, and has not accounted for the proceeds.

That in June, 1835, Ezekiel and Samuel Lynn entered N. W. 11, 10 N. 5 W.; that David loaned Samuel $200, with which to enter the same; that on a partition thereof, Samuel had the east half; that in October afterwards, Samuel sold and conveyed said east half to David; that David retained the deed until his death; that David resided with Samuel on said east half, and made valuable improvements thereon; that Samuel got possession of said deed and still has it; that since David's death, Samuel has enjoyed the use of this land to the value of $200 annually, and has mortgaged it to some innocent mortgagee.

That David paid for Samuel $200 in Connecticut, which has not been repaid; and that, on a settlement, Samuel will be found indebted to the estate several thousand dollars; that, at the time of the purchase of said land, Samuel was poor, and unable to purchase with his own means; that Munn has been willing to execute a deed to the heirs of David Lynn.

Prayer; that Samuel be compelled to exhibit all papers in his possession, &c.; that an account be taken of the amount due the estate from Samuel, for moneys advanced, interest, rents and profits, &c., and a lien on Samuel's part of the land for the amount found due; a partition among the heirs of the real estate according to their respective interests as heirs; and that Munn be required to convey according to the partition.

The answer of Samuel W. Lynn admits he came from Connecticut in 1832; returned in 1833; that he advised his father to make the purchase and settle on the south half of one, ten north, five west, but his father, knowing that he had, at expense, &c. been to Illinois and ascertained the location of said south half, and that it could be purchased, &c., and he (David) being old, &c., and wishing to live with Samuel in preference to his other children, proposed to Samuel that he (David) would accompany him to Illinois and examine the location, and if he (David) thought Samuel had been judicious, &c. he (David) would assist Samuel in making the purchase, and reside with Samuel in his family, provided he (Samuel) would secure him (David) for the advances; which proposal Samuel accepted, and offered to give David a lien on the land purchased, until the advance should be settled either by the repayment of the money, or from the rents and profits of the land, and to these propositions they agreed. Denies that he ever otherwise advised his father to remove to Illinois. Says he did not come through New York to ascertain the terms of the purchase, for he knew the terms long before.

Admits the written proposal of April 18, 1834, but denies that it was made or intended to be made to David; says he (Samuel) made the application to purchase of Munn; that the three months were allowed to him and not to his father, that he (Samuel) might have his father's advice under the agreement between them, and his father's aid if his father approved the purchase.

Denies that he acted for David or under his direction; de-

nies any mistake in the name inserted in said proposition of Munn, or that Samuel's name was inserted without David's knowledge for convenience; yet admits that he had his father's advice in making the purchase according to the terms of the agreement between them; and generally denies all acting under his father except as aforesaid.

Says that he concluded to buy S. ½ 1, and his father agreed to advance him money for that purpose, and that he should give his father a lien upon the land until it should be settled between them, or until David should donate the same to him (Samuel); that thereupon he (Samuel) wrote the letter of June 26th to Munn; denies that he wrote said letter as the agent of David, or that thereby he intended to give David any right in the land further than a right to the lien aforesaid. He says Munn knew the agreement between himself and father, and that the first instalment was to be advanced by his father, and that he could not get this unless his father approved of the location, and therefore he wrote to Munn that David had "concluded to take the land;" and that the words "and pay you as agreed when you send to Quincy a bond for a deed," referred to the first payment, which David was to advance, as Munn knew; and in the letter Samuel for himself, promised to fulfill on his (Samuel's) part the residue of the contract; and Munn, so understanding it, executed the bond of July 19th, to Samuel.

Says Munn's agents informed him, and not David, of the receipt of Munn's bond; that David advanced the first payment to him (Samuel,) and that he (Samuel) paid it over to Munn's agents, not as David's money but as his own.

Is not informed whether Munn referred to the proposition of April 18th, instead of the letter of June 26th, in making the bond, but denies that he should have referred to the letter for that purpose, or that, if referred to, it would have authorized a bond different from the one executed; denies that there was any mistake about it, and that he (Samuel) ever discovered any mistake as charged, but he says that for the purpose of securing a lien to David for his advances, he did request Munn's agents to procure a bond to convey the land to

David on the payment of the purchase money; David agreeing that he would convey the land to Samuel or devise it to him upon a settlement, and that this agreement would have been reduced to writing, but Munn never executed the bond.

He is not informed about the articles of agreement set out in the bill, but Munn executed a deed to David for the land and sent a mortgage to secure $760, to be executed by David, but David refused to accept the deed or execute mortgage.

Denies that any such articles as set out in the bill were ever executed or accepted by David.

Admits that one reason of delay in executing the writings to David to secure David's lien on the land was, that a part of the land was in possession of another, but the more weighty reason was, that such evidences of the contract as he (Samuel) had requested, were never furnished, and this delay continued until David became content without any lien on the land.

Admits the payment of money and the taking receipts therefor as charged, and says that the receipts were so taken to show David the amount of money paid on the land for which David had the right to require a lien; that these advances were settled for between him and David, and as evidence thereof these receipts were surrendered to him, (Samuel.)

Admits that he has made the payments as stated since his father's death, but denies that it was done with David's money or money belonging to the estate, but says it was with his own money.

Denies that his father entered into possession of the premises, but says he (Samuel) entered into possession, and his father resided with him as a member of his family; that his father was old and infirm and that he attended to his (David's) business; that David had little to do; had some considerable stock, &c. which Samuel took care of, fattened, &c. boarded his father, &c. and insists on this as a set-off against all the advances; that the improvements were made by himself at a cost of $3·000.

Lynn *v.* Lynn *et al.*

Denies taking any of David's papers improperly.

Denies admitting that the land was David's.

Admits the writing of the letter of Nov. 14, 1835, and still admits that the rents and profits belonged to David by virtue of the agreement between him and David, but in the same letter he claimed possession of the land in his own right.

Admits that David advanced $30 to aid in making improvements; admits the premises at David's death were worth $5000; admits that since David's death he has had the use and occupation of the premises, and appropriated the rents and profits to the yearly value of $150, and that he received the rents and profits of the improvements from the time they were made to the time of David's death, by the consent of David, having otherwise satisfied David for his advances of money.

Denies selling David's cattle in 1840; says they were his own; denies in like manner selling other property of David's for his own benefit.

Admits that he and Ezekiel in 1835 entered N. W. 11, 10 N. 5 W., yet only in this manner: they each entered one half of S. W. 11 by pre-emption, and thereby had a float for eighty acres each, which they located on the former quarter, and Ezekiel wishing to obtain Samuel's float, David purchased Samuel's float for Ezekiel for $100—the money charged to be loaned by David to Samuel to enter said land; the assignment being made before payment to the United States.

Denies that he ever conveyed the east half of 11 to David; that he ever delivered a deed therefor to David, and that he was ever paid any consideration for so doing.

Denies that he was poor and unable to pay his expenses when he left Connecticut; admits he borrowed $200 on the credit of David in Connecticut; that David paid the note, and that one Coe paid the note to David, and sets up the limitation against demand for the money.

Claims that a large amount of money is due from the estate to Samuel for things therein mentioned.

Denies his dependence on David for means, but acknowledges he was accommodated with advances as aforesaid.

Says David sold in Connecticut for about $2000; that out of this he paid debts about $100; paid expenses here, including complainant's expenses, $300; that during his lifetime he advanced to his five children, or their representatives, about $200 each, making $1000, and that he advanced to Samuel $888·63, which last mentioned sum has been settled except $204·80, against which he claims a set-off, and insists on the limitation.

Says that at his death David had personal property to about the amount of $600, which should have come to the hands of his administrator.

The answer further sets up that the administrator obtained a judgment against Samuel for $450, in an action of trover, and insists on the judgment as a bar against all rights which might have been tried in said cause.

To this answer there was a replication.

The following is an abstract of the depositions.

## Stephen B. Munn.

Has seen David Lynn Sr. once, Samuel twice. Saw David in April, 1834, in Jersey city, on his way to Illinois. Saw Samuel in 1832 or spring of 1833, on the subject of purchasing some land owned by me; in April 1834 saw him on same business; did not see them together; sold to David Lynn south half one, ten north, five west, for $960, $200 down, balance $100 annually with interest. Sold land in May or June 1834; don't think he had any conversation with David Lynn about the land. In April 1834 wrote a proposition to Samuel to sell him the land; no recollection of the exact words of the conversation, but has no doubt the understanding was that David Lynn Sr. was to pay for the land and own it, and not Samuel W. Lynn, and I was to be informed in three months whether Samuel's father would take the land; received the letter of June 26th, and thereupon forwarded the contract.

Has no recollection about it, but has no doubt Samuel was acting for his father; he executed a contract to David Lynn for the land; giving a copy thereof of date 26th June, 1834,

(date in pencil,) [which articles are different in form from the proposition and bond set out in the bill and admitted in the answer.]

The contract was executed in pursuance of the proposition of April 18, 1834; sent the contract to his agents at Quincy to be delivered to David Lynn; has directed his agents to return the money received from Samuel; states the amount of money received from David Lynn.

*Cross-examined:*—Samuel's first business with witness, as he believes, was to ascertain from him on what terms and at what price he would sell it; (the land); has no recollection. or belief that Francis C. Moore ever signed a letter for him, on reflection thinks there was a communication; April 18th, 1834, gave Samuel the terms on which he would sell the land; thinks he had given Samuel the proposition before he saw his father, and had no communication from David concerning the sale at that time; the only contract he ever made for the sale of this land is contained in his answer to seventh interrogatory; has been advised by his agents that they have the contract (of June 26th) in their possession; repeats that he never made any other contract except of June 26th.

A copy of the discharge of Samuel W. Lynn under the insolvent laws of Connecticut, first date 4th Tuesday of August, 1833, last date 25th August, 1834, was also given in evidence.

### *James Harbison.*

Knows the parties; Samuel W. Lynn has resided on the place formerly occupied by David Lynn, deceased, his father; is residing there to best of his knowledge; about five years ago levied on a yoke of steers as Samuel's property; Samuel denied owning property; stated the property belonged to his father; Samuel refused to give up the property on the ground of the illegality of the execution, likewise on the ground of having no property; witness was sued by David Lynn for taking off the cattle; Samuel offered himself as a witness, and wished to prove the cattle were his father's; there was other property on the place.

*Cross-examined.*—Saw David living there at the same time Samuel was living there; saw David living by himself in a house on the place.

### Thaddeus Eames.

Supposes David to have been seventy years old; David lived with Samuel and died there; David Lynn claimed to own the farm; the old man told him (witness) he bought the place of Munn, (objected to.) Witness supposes the improvements on the place were made by Samuel as David's agent; the crop was gathered on the place as if they were both one family.

*Cross-Examined.*—They lived as one family, Samuel appeared to conduct the improvements as his own; Samuel furnished the work and materials as far as witness knew.

### Wm. D. Henderson.

David Lynn and Samuel W. Lynn resided together up to the time of David's death, on south half one, ten north, five west; Samuel still lives there; David Lynn said witness had cut two trees on his (David's) land, and he (David) intended to prosecute him for it; Samuel was within hearing and said nothing about title; the land on which the trees were was the same half section; it was in July or August, 1835.

*Cross-examined.*—Has had quarrel with Samuel W. Lynn; it was in a quarrel the conversation mentioned took place; is not friendly with Samuel; Samuel joined his father in threatening to prosecute; Samuel said he (witness) had built a house on his (Samuel's) land, and he (Samuel) intended to take it, meaning south half one, ten north five west, as witness presumes.

### William R. Jamieson.

David Lynn said he had bought the land; don't recollect whether it was in Samuel's presence; thinks Samuel didn't claim to own it (the land) from their first settling there; don't think the Lynns had much money when they first came there; had the personal property together.

### Delight Camp.

Is acquainted with the Lynns; in 1836 lived with Samuel about two months; place belonged to Samuel, so far as she has heard David express himself; has seen David sell grain raised on the place, and bring the money and give it to Samuel's wife, and when she offered him a part back he said he had money of his own; Samuel acted as owner as far as witness could judge; old man appeared feeble, worked in the garden sometimes.

### Julia Curtis.

Acquainted with the parties except Munn; knows the farm of Samuel Lynn;. has lived with him four months, the summer of the old man's death, and prior to his death; has been there frequently at other times; don't know that she ever heard David give any directions about the farm or exercise any control over it; Samuel acted as the owner of the farm; heard Ezekiel W. Lynn (one of complainants) say that Samuel had a large farm in this country, that Samuel's farm was on the bluff; thinks the place referred to was the place where Samuel resides; David lived with Samuel; witness was employed by Samuel, and he paid her.

### Samuel Darnell.

Is acquainted with the parties except Munn; knows the land; always supposed before this suit that Samuel was the owner of it; he had entire control of the farm, hired hands, did all the business, so far as witness knew anything about it; witness helped Samuel about the building of the barn, and sent hands, and Samuel paid for them; witness rented ground on the farm, and nobody had anything to say about it but Samuel; the old man went to borrow money for Samuel to pay part on the place, as witness understood; witness' brother agreed with Samuel to let Samuel have it; as to the heirs of David, deceased, Cook had a claim on the land where he lives; Ezekiel had a claim where he lives; John A. Lynn had a claim on a piece of land south of Ezekiel's; David, administrator, bought a claim of Lewis which cost $75, as wit-

ness understood, and knew David to be in possession of it; Asa Brainard also had a claim where Riessel now lives, and Samuel lived where he now resides, each cultivating or improving his own; has as good reason to believe that Samuel was improving for his own benefit as that the others were for theirs; as far as witness knows, David Sr. had no more control over Samuel than the others; all the heirs lived in the neighborhood of witness except David, who moved to Iowa two or three years; David Sr. appeared to live with Samuel; thinks Samuel took possession of the place in 1833.

*Cross-examined.*—Thinks the money was borrowed of his brother to pay on the land; does not know who signed the note except what his brother said; witness presented the note to the administrator, but he said if any money was borrowed Samuel borrowed for himself.

### Orrin Camp.

Knows the land; thinks he heard all the heirs say they made selections of land, and David Sr. assisted them to pay for it; has heard David Sr. say he helped all of them to pay for their land; Samuel selected south half ten north, five west; Samuel has continued to improve his; the old man said if Samuel would build the barn near the house he would help him, otherwise he would not; heard David Sr. say his other children (except Samuel) had got every d—d cent they would ever get; don't think he meant to include John A. Lynn (deceased.) .

### Jessee Cornell.

Acquainted, &c. David Sr. lived with Samuel; knows the land; loaned money to pay for the land; Samuel first spoke about it; David Sr. came down and got it; brought an order authorizing witness to sign Samuel's name to a note for the money, which was done, and the money loaned; note has been taken up by Samuel, to best of witness' recollection; David said he had assisted Samuel more than his other children, because he lived with Samuel, and expected to live with him for life; witness understood that the money was borrowed by Samuel to pay for the land.

### Daniel Putnam

David Lynn Sr. said he had given all his children money to buy land, with the exception of Mr. Brainard; understood Samuel's land was the land where he lives; understood the land belonged to Samuel when paid for; David lived with Samuel.

*Cross-examined.*—Witness, in that conversation, understood that David had given all his children money to buy land, but to one he had not given so much as the rest, or had not given any; David Sr. said in reference to the land (S. ½ 1,), what is here is mine, but at my death all is Samuel's; that he lived with Samuel, and at his death all was Samuel's.

*Re-examined.*—David Sr. said Samuel had not yet paid for it, but it was his when paid for.

### Peter Butler

Was sheriff of Warren from 1832 to 1834; surveyed the land; recorded survey in the name of David; Samuel paid for surveying.

### Patrick R. Haley.

Collected taxes 1835 and 1836; called at old man Lynn's and collected some taxes; cannot tell whether old man paid taxes on that land or not; the tax on the land was paid by Samuel; the receipt given in David's name.

There was also given in evidence a tax receipt for 1836, given to Samuel W. Lynn, for south half one.

At the September term, 1848, the Circuit Court pronounced a decree in substance as follows:

That the south half one be partitioned among the heirs, David Lynn having been equitable owner thereof;

That Samuel pay the rents and profits of the land while in his possession;

That Samuel be paid for the lasting and valuable improvements made on the land by him;

That Samuel be refunded that part of the purchase money paid by him since his father's death, with interest;

That the cause be referred to a Master to ascertain the

value of the rents and profits, and improvements; a lien decreed on the land in whosesoever favor a balance should be found;

That Munn should convey to the heirs according to their respective portions.

As to all other matters that the bill be dismissed, and each party pay half the cost.

The defendant, Samuel W. Lynn, appealed.

*Julius Manning* for appellant:

1. Implied trusts and when implied. 2 Story's Eq. Jur. 439, § 1195; 443, § 1201.

2. Resulting trusts are admitted with great caution. The proof should be clear. *Boyd* v. *McLean*, 1 Johns. Ch. R. 590, *per* Kent, Ch'r, "An arbitrary implication raised, to stand until some reasonable proof brought to the contrary." 2 Blackf. 214. Proofs must be very clear. 3 Sug. on Vend. 257; 8 N. H. 196; 10 Vesey, 517; 3 Sug. on Vend. 178, § 6; 4 Gilm. 218-19.

3. It is essential that the money when paid should have been the money of the person in whose favor the trust is set up. *Steere* v. *Steere*, 5 Johns. Ch. R. 1; 8 N. H. 197.

4. " It seems doubtful whether parol evidence is admissible against the answer of the trustee, denying the trust." 3 Sug. on Vend. 257, § 2. *Bartlett* v. *Pickersgill*, 4 East, 577, in note. But if admissible, it should be received with great caution. *Boyd* v. *McLean*, 1 Johns. Ch. R. 582; *Snelling* v. *Utterback*, 1 Bibb, 609.

5. An equitable presumption may be rebutted by parol. 10 Vesey, 367. And parol evidence is admissible to show the intention that the person to whom the conveyance was made should take beneficially. 2 East, 534, note *b;* 1 Vesey, 57; 2 Ch'y 416; 1 P. Williams, 112, 113.

6. An express trust, though by parol, prevents a resulting trust. 3 Sug. on Vend. 260, § 10. A payment after the purchase will not raise a trust; the estate can only be charged *pro tanto* for the amount actually paid at the time of the purchase. *Steere* v. *Steere*, 5 Johns. Ch. R. 1 ; 2 do. 414.

7.   If the money was paid for the purpose of vesting the title in the grantee, no trust resulted to the person paying the money.   *Elliott* v. *Armstrong*, 2 Blackf. 214.

8.   Where a parent purchases land in the name of his son, the purchase is to be deemed *prima facie* an advancement, so as to rebut the presumption of a resulting trust.   2 Story's Eq. Jur. 446, §§ 1202, 1203; Lord C. J. Eyre, in *Dyer* v. *Dyer;* ib. note 3; 3 Sug. on Vend. 266, *et seq.;* ib. 261, *et seq.; Grey* v. *Grey,* 2 P. Williams, 628 ; *Murless* v. *Franklin,* 1 P. Williams, 13 ; *Mumma* v. *Mumma,* 2 Veron's Ch. R. 19; *Lampleigh* v. *Lampleigh,* 1 P. Williams, 111 ; *Crabb* v. *Crabb,* 7 Eng. Ch. R. 147 ; *Kelpin* v. *Lamb,* ib. 150 ; *Finch* v. *Finch,* 15 Vesey, 43 ; *Sidmouth* v. *Sidmouth,* 17 Eng. Ch. R. 467 ; 2 Beavan, 447 ; *Taylor* v. *Taylor,* 4 Gilm. 303.

*Charles Gilman,* for the appellees.

Samuel W. Lynn, acting as the agent of his father, David Lynn, with means furnished by his father from time to time as the instalments fell due, purchased of Munn the land in controversy, taking receipts in the name of the father, (see the various writings signed by S. W. and by Munn, as also the receipts for the several payments.)   After the father's death, the son paid an instalment with his own means.   S. W. admits that the money was so furnished, and alleges that the receipts were so taken to give his father a lien on the property for such advances until a settlement between them, which he affirmatively asserts did take place, and in evidence thereof further says that the receipts were delivered over to him.   It did not appear, however, that the receipts taken by him on the payments ever went out of his possession, except by inference from his statement that they were delivered up to him.   He further states that these several amounts coming from his father, were intended as advancements or donations ; affirmative allegations, not responsive to the charges of the bill, and therefore not evidence unless supported by other proof.   There is nothing in the whole case to show affirmatively that these payments were intended as advancements,

nor are there circumstances from which such an intention is to be inferred. The whole case shows that S. W. had no. means—was obliged to hire money to come to the State, which his father was security for and subsequently paid. It further appears that he did not claim the land, but, while his father was living, was willing, to say the least, that it should be considered as his father's. The only conclusion legitimately to be drawn from all the circumstances of the case, is that David Lynn, the father, was the purchaser and equitable owner of the land in question, and, had he have lived, would have paid the remaining instalment and taken the title from Munn, and the land, at his death, would have descended to the complainants.

On the whole, the decree of the Circuit Court is in accordance with the strict equity of the case, and ought not to be reversed, or modified in any respect.

The Opinion of the Court was delivered by

CATON, J. On the 18th of April, 1834, Stephen B. Munn made a written proposal, by the terms of which he offered to sell to Samuel W. Lynn the premises in question, upon certain specified terms, and allowed three months within which to accept the proposition. On the 26th of June, 1834, S. W. Lynn wrote to Mr. Munn, stating that his father, who was David Lynn, now deceased, accepted the proposition, with perhaps some slight modifications, and signed the letter "Samuel W. Lynn, for his father, David Lynn." On the back of a copy of this letter, on the 19th of July, 1834, Munn wrote and executed a covenant to convey the premises to S. W. Lynn, upon the payments being made according to the terms as specified in the letter of acceptance, which agreement was delivered to Samuel, who made the first payment with the money, as is alleged, of David Lynn, and a receipt was taken specifying that the money was received of David by the hands of Samuel. Similar receipts were taken for all the balance of the purchase money, which was paid prior to the death of David. The balance, $286·10, was paid by Samuel W. to the agents of Munn. Some time after the execution

Lynn *v.* Lynn *et al.*

of the agreement of the 19th of July, at the suggestion of Samuel W. Lynn, Munn executed in New York, and forwarded to his agents in Quincy, a more formal indenture for the conveyance of the land to David Lynn, which was probably never seen or executed by David, but still remains in the agents' hands.

The bill charges, that it was the design and intention of all parties, that the sale of the land should be and was to David, and not to Samuel W., and that the name of the latter was inserted in the original proposition, and in the agreement of the 19th of July, by mistake, and that all the payments which were made up to the time of David's death, were made with his money.

Samuel W. in his answer denies the alleged mistake, and insists that the sale was intended to be made to him, and that although the money with which the payments were made came from his father, yet it was advanced to him as a loan, and that the receipts were taken in his father's name as an evidence of the amount of money paid, and for which David was entitled to a lien upon the land. The answer admits that Samuel W., after the agreement of the 19th of July, requested Munn's agents to get a bond for a deed running to David, as he says, in order that David might hold the land, who was to obligate himself to convey the land to Samuel W. or devise it to him, upon settlement, and that this agreement would have been reduced to writing, but that Munn never executed the bond. It may be here remarked that if Munn never executed such a bond, he did execute and forward to his agents an agreement or indenture, the effect of which was the same, which, in all human probability, was executed in pursuance of the suggestion made by Samuel W. to Munn's agents, that his father should have a bond for a deed. Samuel went into possession, made improvements, and cultivated a farm upon the premises, and David resided there with him till the time of his death. David was old and infirm, and able to do but little manual labor at least.

Munn swears that he sold the land to David, and to no other person, and pertinaciously insists that he never made

any contract for the sale of the land, except the one which which he sent on to his agents, and which appears never to, have been executed or accepted by David. A good deal of evidence is adduced, showing the circumstances of Samuel, and his conduct and professions, as well as those of David, in relation to the purchase and ownership of the land.

It is not a question of so much real as apparent difficulty, · to determine for whose benefit this contract and purchase were really made, and to whom, in equity, this land really belongs. Upon a careful examination of the whole record we are satisfied with the decree of the Circuit Court. Were David alive, and this claim set up by him, instead of his heirs, there can be little doubt that his right should be sustained, and yet his legal representatives occupy precisely the same position.

Strictly speaking, it cannot be said that here is a resulting trust, for that is raised by implication or operation of law, from a particular state of facts evidencing the equitable rights of the parties, and does not depend upon a contract for its existence: as where land is purchased by the money of one and the title is conveyed to another, or perhaps where one trustee receives a title from another. In such a state of facts a trust is created by law, and not by the agreement of the parties. *Bottsford* v. *Burr*, 2 Johns. Ch. R. 405. In case of a resulting trust, there should be a transfer of the legal title to one, while another is possessed of the equity. Here there has been no transfer of the legal title, but that still remains in Munn, whose liability to transfer it grows out of this contract of sale, and does not depend upon the simple fact of his having received the purchase money. The true character of this bill is for the specific performance of that contract, and not to compel the performance of a resulting trust. In cases of resulting trust it is frequently competent to inquire into the agreements of the parties, but then it is for the purpose of ascertaining with whose money the purchase was made. Samuel W. Lynn does not hold the legal title, and cannot be considered a trustee. Munn still holds the legal title, which he has agreed to transfer, and the question is, to whom he

shall specifically perform the agreement. Thus the whole case is reduced to this one question; was it the intention of parties, that the sale and purchase should be for the benefit of David or Samuel? It will not do to rely upon the last formal indenture, running to David Lynn, which was executed on the part of Munn, but never executed by David on his part, as the contract of sale, for that was never executed or took effect. We must, therefore, look to the antecedent negotiations and transactions, together with the circumstances of the case as explanatory thereof, in order to determine to whom the sale was actually intended to be made.

So far as the written evidence shows, the first is a proposition for the sale of the land, in terms running to Samuel. This is answered by Samuel accepting the proposition for and in the name of his father. Upon the back of a copy of this letter of acceptance, Munn executed an undertaking: "in consideration of the within, and in fulfillment of the agreement as aforesaid," he bound himself to convey to Samuel, "when he shall have fulfilled, on his part, the conditions of the said agreement, a copy whereof is hereunto annexed." These three papers constitute the only evidence of the contract of sale upon which we can rely, except so far as it is competent for a Court of Equity to look to the other evidence to correct any mistake which was committed in drawing up the written evidence of the contract. For that purpose parol evidence is competent, but not to explain the meaning of the parties as expressed in the writings.

If we are to look alone at these papers, no doubt can exist that it was the intention of Samuel W. Lynn, only to occupy the position of an agent, and not of a purchaser. He intended to bind his father and not himself for the payment of the purchase money. He proposed to purchase for his father, and not for himself. Such is undoubtedly the legal construction of that letter of acceptance, and as we have before seen, it is not competent to explain its meaning, either by parol evidence or the defendant's answer, or in any way to alter it, except by showing a mistake, which is not pretended. Munn could have maintained no suit against Samuel for the pur-

chase money, for he never undertook to pay it. Samuel's attempt, in his answer, to explain away the effect of this letter must be unavailing, for he does not pretend there was any mistake in its terms, and hence the letter alone must evidence that intent. But if it were proper to look at the other evidence in the case, we think it abundantly proved, even in opposition to any thing contained in his answer, that it was his intention that the sale should be made to his father, and that it was his understanding that it was so made. After he saw that Munn had agreed to convey to himself, he requested that a bond for a deed to his father should be given.

The purchase money was all advanced by his father, in whose name the receipts were taken. His father lived with Samuel upon the land, and claimed to own it during his life time, although he sometimes manifested an intention to donate or devise it to Samuel, and once or twice even expressed himself as if it actually belonged to his son. Indeed the personal property upon the farm, when it was taken to satisfy Samuel's debts, was claimed by David, and Samuel offered to swear that it belonged to him.

These circumstances, which tend so strongly to prove that the purchase was made by and for David, and so understood and intended by Samuel, the latter attempts to explain away in his answer by insisting that the purchase money thus advanced by his father was really intended as a loan to him, and that the conveyance was to go to his father as a security, David agreeing to convey to Samuel upon a settlement of the advances so made, or to devise the land to him. But it must be remembered that this allegation of a loan is a new averment set up in the answer, and which is not proved by it, but must be sustained by affirmative evidence. Such evidence is wanting in this record. We are of opinion that this record shows, that it was the intention and understanding of both David and Samuel W. Lynn, that the purchase was made by and for David, who alone was bound to pay the purchase money. Such is both the legal and equitable construction of this contract of purchase. Such being the case, under the circumstances as presented, even if Munn

intended to sell, and supposed he was selling to Samuel instead of David, most probably the latter, or his heirs, would be entitled to a specific execution of the contract in their favor. But we think it equally clear that Munn intended to sell and supposed he was selling to David, and that Samuel's name was inserted in the instrument indorsed on the copy of the letter of acceptance, instead of David's, by mistake. By that letter Munn's proposition to sell the land was accepted by Samuel as the agent of David, and for him and in his name. The covenant to sell and convey was indorsed on the back of a copy of this, and referred to it as the consideration of the undertaking and professes to be in fulfillment of it, and says the land shall be conveyed "when he shall have fulfilled, on his part, the conditions of said agreement, a copy whereof is hereunto annexed." No man can read this covenant without being convinced that it was the intention of Munn to make his covenant, which was his part of the contract of sale, conform to the other part, which was contained in the letter referred to, which bound David Lynn to purchase and pay for the land. It took both of these papers to constitute the contract of sale and purchase of this land, and Munn could have had no other design than to make his part of the agreement conform to the other, if he intended to avail himself of the obligations contained in it. We, therefore, think that the papers themselves furnish sufficient evidence of the alleged mistake. But more than this: Munn swears that he never intended to sell and never did sell the premises to Samuel W. Lynn, but that he sold them to David alone. It is true he does not state directly, that the name of Samuel was inserted by mistake in that contract, for it seems impossible to make him recognize that agreement at all, and he insists that the subsequent indenture, which does not appear to have been executed by David, contains the only evidence of the sale. In this, however, he is evidently mistaken, for the other papers stand here undisputed, and, as we have already seen, show a complete

contract. At any rate his testimony seems to show that at no time did he ever intend to sell to Samuel, and consequently, if, by the terms of the agreement, he proposed to sell to him, it was by mistake.

The decree very properly provides for reimbursing Samuel for whatever permanent improvements he may have made upon the land, as well as for the purchase money which he has paid since his father's death, and with this he must be content. It may be true that it was the intention of his father to donate or devise the land to him, perhaps as a consideration, in part, for the care which he took of him in his old age, but until such intention was carried out by a conveyance or bequest, it could create no legal or equitable right which the Court can recognize. If he is entitled to any compensation for taking care of or providing for his father, we cannot award it to him in this proceeding, but he must seek his remedy elsewhere.

The decree of the Circuit Court is affirmed and a *procedendo* awarded to the Circuit Court.

*Decree affirmed.*